UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LANDIS P.

                Plaintiff,

     -v-                            8:17-CV-681

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                     OF COUNSEL:

SCHNEIDER & PALCSIK         MARK A. SCHNEIDER, ESQ.
Attorneys for Plaintiff
57 Court Street
Plattsburgh, NY 12901

SOCIAL SECURITY ADMINISTRATION   CHRISTOPHER L. POTTER, ESQ.
   OFFICE OF REGIONAL GENERAL     Special Ass't United States Attorney
   COUNSEL – REGION II
Attorneys for Defendant
26 Federal Plaza, Room 3904
New York, NY 10278

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

     On June 22, 2017, plaintiff Landis P.[1] ("Landis" or "plaintiff") filed this action seeking

review of defendant Commissioner of Social Security's ("Commissioner" or "defendant") final

---

[1] In accordance with a May 1, 2018 memorandum issued by the Judicial Conference's Committee on Court Administration and Case Management and adopted as local practice in this District, only claimant's first name and last initial will be used in this opinion.

decision denying his application for Supplemental Security Income ("SSI").  Defendant filed a certified copy of the Administrative Record, both parties briefed the matter, and the appeal was referred to U.S. Magistrate Judge Daniel J. Stewart for Report and Recommendation.[2]

However, on March 31, 2020, Chief U.S. District Judge Glenn T. Suddaby terminated the case referral to Judge Stewart, leaving Landis's appeal to be decided directly by this Court.  The matter will be considered on the basis of the submissions without oral argument.

## II. __BACKGROUND__

On September 7, 2010, Landis filed for disability benefits alleging that his Tourette's Syndrome, Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety, and depression had rendered him disabled since June 19, 1983.  R. at 73-80; *see also* R. at 43, 182-89.[3]

Landis's claim was initially denied on November 3, 2010.  R. at 40-43.  At plaintiff's request, a video hearing was held before Administrative Law Judge ("ALJ") Arthur Patane on December 29, 2011.  *Id*. at 25-38.  Plaintiff, represented by attorney Mark Schneider, appeared and testified from Plattsburgh, New York.  *Id*.  Thereafter, the ALJ issued a written decision denying plaintiff's application for benefits.  *Id*. at 10-19.  This decision became final on June 6, 2013, when the Appeals Council denied plaintiff's request for review.  *Id*. at 1-3.

On June 28, 2013, Landis timely filed for review of the Commissioner's final decision before this Court.  *Provost v. Colvin*, 8:13-CV-761 (N.D.N.Y.).  However, on February 5, 2014, the parties stipulated to a "sentence four" remand, which returned plaintiff's benefits claim to the Social Security Administration (the "SSA" or the "Agency") for additional

---

[2] General Order 18 provides, *inter alia*, that a claimant's appeal from the Commissioner's final decision denying benefits will be treated as if the parties have included in their briefing cross-motions for judgment on the pleadings under Fed. R. Civ. P. 12(c).

[3] Citations to "R." refer to the Administrative Record.  Dkt. No. 18.

administrative proceedings.  *Id*. at Dkt. No. 21; *see also* R. at 1138.   U.S. Magistrate Judge

David E. Peebles "so ordered" the parties' stipulation, closed the 2013 file, and returned the

matter to the Agency.  *Id*.

On March 2, 2016, the Appeals Council remanded Landis's claim to the ALJ for further

consideration of the opinion evidence.  R. at 1138-42.  The remand order also directed the

ALJ to obtain the testimony of a Vocational Expert.  *Id*.  In accordance with the Appeals

Council's remand order, ALJ Patane held a second video hearing on November 3,

2016.  *See id*. at 1161.  Plaintiff, still represented by attorney Mark Schneider, appeared and

testified from Plattsburgh, New York.  *Id*.  This time, the ALJ also solicited testimony from a

Vocational Expert.  *Id*. at 1073-74.

On May 30, 2017, ALJ Patane issued a second written decision denying Landis's

application for benefits.  R. at 1065-74.  Because the matter was on remand from the

Appeals Council, the ALJ's decision became the final decision of the Commissioner by

operation of law after the Appeals Council declined review.  *See* 20 C.F.R. § 416.1484(a).

On June 22, 2017, Landis filed this action seeking review of the Commissioner's

second denial of benefits.  However, in lieu of immediately proceeding to brief the merits of

plaintiff's appeal, the parties instead stipulated to a "sentence six remand," which permits a

reviewing court to retain jurisdiction over the case while the matter is returned to the Agency

for an opportunity to clean up a procedural issue or other error.  Dkt. Nos. 9, 10.  As relevant

here, the Agency was apparently unable to produce a written transcript of ALJ Patane's

November 3, 2016 video hearing.  *Id*.

On December 17, 2018, a new ALJ—Mary Sparks—held a new video hearing in

accordance with the sentence six remand order.  R. at 1085-1114.  Landis, still represented

by attorney Mark Schneider, appeared and testified from Plattsburgh, New York.  *Id*.  The

ALJ also heard testimony from Vocational Expert Thomas Heiman.  *Id*.  Thereafter, ALJ

Sparks issued a written decision denying plaintiff's application for benefits a third time.  *Id*. at

1036-1050.

On May 6, 2019, the Court reopened Landis's civil case.  Dkt. Nos. 11, 12.  Shortly

afterward, ALJ Sparks issued a slightly amended version of her written decision denying

plaintiff's benefits claim.  R. at 1004-21.  The Commissioner's third denial of benefits has

since become final for purposes of review in this forum.  Dkt. Nos. 11, 12.

## III.  DISCUSSION

### A.  Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether

the decision is supported by substantial evidence and the correct legal standards were

applied.  *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).  "Substantial

evidence means 'more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consol.*

*Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from both

sides, because an analysis of the substantiality of the evidence must also include that which

detracts from its weight."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

If the Commissioner's disability determination is supported by substantial evidence,

that determination is conclusive.  *See Williams*, 859 F.2d at 258.  Indeed, where evidence is

deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld—even if the court's independent review of the evidence may differ from the Commissioner's.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## B.  Disability Determination—The Five-Step Evaluation Process

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's:

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id*. § 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  At step one, the ALJ must determine whether the claimant has engaged in substantial gainful activity.  A claimant engaged in

substantial gainful activity is not disabled, and is therefore not entitled to

benefits. *Id*. §§ 404.1520(b), 416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires

the ALJ to determine whether the claimant has a severe impairment or combination of

impairments which significantly restricts his physical or mental ability to perform basic work

activities. *Id*. §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from a severe impairment or combination of

impairments, then step three requires the ALJ to determine whether, based solely on medical

evidence, the impairment or combination of impairments meets or equals an impairment

listed in Appendix 1 of the regulations (the "Listings"). *Id*. §§ 404.1520(d), 416.920(d); *see*

*also id.* Pt. 404, Subpt. P, App. 1.  If the claimant's impairment or combination of impairments

meets one or more of the Listings, then the claimant is "presumptively disabled." *Martone*,

70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires the ALJ to assess

whether—despite the claimant's severe impairment—he has the residual functional capacity

("RFC") to perform his past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The burden

of proof with regard to these first four steps is on the claimant. *Perez v. Chater*, 77 F.3d 41,

46 (2d Cir. 1996) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d

Cir. 1983)).

If it is determined that the claimant cannot perform his past relevant work, the burden

shifts to the Commissioner for step five. *Perez*, 77 F.3d at 46.  This step requires the ALJ to

examine whether the claimant can do any type of work.  20 C.F.R. §§ 404.1520(g),

416.920(g).

The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to determine whether a claimant retains the RFC to perform work in any of five categories of jobs:  very heavy, heavy, medium, light, and sedentary.  *Perez*, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2).

"[T]he Commissioner need only show that there is work in the national economy that the claimant can do; [she] need not provide additional evidence of the claimant's residual functional capacity."  *Poupore*, 566 F.3d at 306 (citing 20 C.F.R. § 404.1560(c)(2)).

## C.  ALJ's Decision

ALJ Sparks applied the five-step disability determination to find that:  (1) Landis had not engaged in substantial gainful activity since July 31, 2010, the amended onset date; (2) plaintiff's Tourette's Syndrome, anxiety disorders, ADHD, personality disorder, and history of substance abuse in remission were severe impairments within the meaning of the Regulations; and that (3) these impairments, whether considered individually or in combination, did not meet or equal any of the Listings.  R. at 1010-11.

At step four, the ALJ determined that Landis retained the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to performing simple, repetitive jobs defined as those having no more than 1 to 2 tasks; he can perform "low stress" jobs, defined as those having no more than occasional decision-making required or no more than occasional changes in work setting; he can have no more than occasional interaction with the public or coworkers, and is unable to perform in-tandem work with coworkers.

R. at 1011.

The ALJ determined that Landis had no past relevant work.  R. at 1020.  However, the

ALJ relied on the Grids and on the testimony of the Vocational Expert to conclude that plaintiff retained the RFC to perform jobs such as a commercial janitor or cleaner, a garbage collector, or a "cleaner II." *Id*. at 1021. Because those jobs existed in sufficient numbers in the national economy, the ALJ concluded that plaintiff was not disabled during the relevant time period. *Id*. Accordingly, the ALJ denied plaintiff's application for benefits. *Id*.

### D. **Landis's Appeal**

Landis's 55-page brief raises a litany of issues on appeal. Pl.'s Mem., Dkt. No. 21, 33-57.[4] After reordering these arguments to better adhere to the five-step sequential analysis, plaintiff asserts that the ALJ: (1) failed to consider the limitations caused by plaintiff's "morbid obesity"; (2) should have found him presumptively disabled under one or more of the Listings; (3) violated the remand order by giving more weight to consulting examiners than to plaintiff's own treating sources; and (4) should have credited plaintiff's testimony about the more severe limiting effects of his conditions. *Id*.

### 1. **Morbid Obesity**

At step two, the ALJ must determine whether a claimant has one or more "severe" impairments that significantly limit his physical or mental ability to do basic work activities. *Tahira H. v. Comm'r of Soc. Sec.*, 2020 WL 42823, at *4 (N.D.N.Y. Jan. 2, 2020). These "basic work activities" include "walking, standing, sitting, lifting, carrying pushing, pulling, reaching, handling, seeing, hearing, speaking, understanding, remembering and carrying out simple instructions, using judgment, and responding appropriately to supervision, co-workers, and usual work situations." *Erik Allen M. v. Berryhill*, 2019 WL

---

[4] Pagination corresponds with CM/ECF.

3565944, at *3 (N.D.N.Y. May 22, 2019) (citation omitted).

"As a general matter, this step of the sequential evaluation process sets a low bar that is intended only to screen out disability claims based on *de minimis* impairments." *Erik Allen M.*, 2019 WL 3564944, at *3 (citing *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 152 (N.D.N.Y. 2012) (Kahn, J.)).  "Even so, the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment,' is insufficient to render a condition 'severe' within the meaning of the Regulations." *Id*.

"Rather, the burden at this step falls on the claimant to identify how the particular symptomatology stemming from the impairment claimed to be 'severe' actually works to 'significantly limit' his physical or mental ability to complete 'basic work activities.'" *Erik Allen M.*, 2020 WL 42823, at *3 (quoting *Lake v. Colvin*, 2016 WL 2757750, at*4 (N.D.N.Y. May 12, 2016)).

Landis contends the "ALJ failed to *properly* and *fully* consider Plaintiff's morbid obesity as either a severe impairment in and of itself or in combination with her [*sic*] other impairments."  Pl.'s Mem. at 51-53 (emphasis in original).  According to plaintiff, his obesity factored into his anxiety and depression and therefore should have been considered a "severe" impairment at step two.  *Id*.

Upon review, this argument is rejected.  A review of the transcript confirms that ALJ Sparks explicitly considered the issue of Landis's obesity as part of her step two discussion.  R. at 1010.  That discussion shows that the ALJ declined to find plaintiff's obesity to be a "severe" impairment because "[t]he record does not show that the claimant's obesity results in any significant functional impairment."  *Id*.

Landis's argument on appeal has the same problem the ALJ identified in the

proceedings below—he has again failed to show how his obesity, morbid or otherwise, has impacted his ability to perform any basic work activities.  Importantly, the Agency's policy interpretation in effect during the relevant time period did not instruct ALJs to presume that simply being obese *necessarily* caused any particular degree or kind of functional impairment.  SSR 02-1p, 2002 WL 34686281, at *4 ("There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment.  Neither do descriptive terms for levels of obesity (e.g., "severe,' 'extreme,' or 'morbid' obesity) establish whether obesity is or is not a 'severe' impairment for disability program purposes.").[5]

Rather, Landis was obligated to demonstrate to the ALJ the same thing he is obligated to demonstrate to this Court:  a functional limitation causally attributed to his obesity.  Because he failed to carry that burden, this argument is appropriately rejected.  *See, e.g.*, *Jones v. Comm'r of Soc. Sec.*, 2018 WL 3829119, at *2-*3 (W.D.N.Y. Aug. 13, 2018) (rejecting step two argument because plaintiff failed to show how the claimed impairment "impacted his ability to perform work-related functions").

Landis's other obesity-related argument fares no better.  According to plaintiff, the ALJ also failed to consider how his obesity exacerbated the limiting effects of his anxiety and depression.  Of course, "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity."  *Kelsey v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 437, 444 (W.D.N.Y. 2018) (citation omitted).

But the ALJ found that Landis's anxiety and depressive disorders were "severe" at step two and then considered, in exhaustive detail, the longitudinal medical and other

---

[5]  That same is true for the policy ruling that replaced it.  *See* SSR 19-2p, 2019 WL 2374244.

evidence associated with these conditions.  R. at 1010-20.  As part of her detailed

consideration of that evidence, the ALJ examined the limiting effects that plaintiff's anxiety

and depression had on his ability to complete basic work activities.  *Id*.

In other words, the ALJ fully considered Landis's anxiety and depression, however

those conditions might (or might not) have been magnified by plaintiff's morbid obesity, as

part of her discussion of the opinion evidence and in making her RFC determination.  Thus,

despite bearing the burden at this step, plaintiff "points to nothing in the record demonstrating

that [his] obesity caused limitations in excess of those provided in the RFC."  *Kelsey*, 335 F.

Supp. 3d at 445 (citation omitted).  Accordingly, the ALJ did not commit any reversible error

at step two.

## 2.  The Listings

A plaintiff who meets or equals a Listing is "conclusively presumed to be disabled and

entitled to benefits."  *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995).  However, "[f]or a

claimant to show that his impairment matches a listing, it must meet *all* of the specified

medical criteria.  An impairment that manifests only some of those criteria, no matter how

severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Landis argues the ALJ should have found him disabled under Listings 12.04, 12.06,

12.08, or 12.11.  Pl.'s Mem. at 45-51.  All four of these Listings are found in Section 12.00,

which deals with mental disorders in adults.  Broadly speaking, each Listing in this section is

broken down into multiple paragraphs of different requirements that must be satisfied in order

for a claimant to qualify as disabled.

The criteria in paragraph "A" of each individual Listing usually requires the claimant to

provide medical documentation of signs and symptoms that are consistent with the existence

of a particular disorder, while the criteria in paragraph "B" (and sometimes paragraph "C") of each Listing requires the claimant to show that the manifestation of that disorder also causes particular degrees of limitation in common areas of mental functioning.

Landis argues that he satisfies all of the required criteria under Listing 12.04 (depressive, bipolar and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), Listing 12.08 (personality and impulse-control disorders), or Listing 12.11 (neurodevelopmental disorders).

Listing 12.04 requires a claimant to show:

A.  Medical documentation of the requirements of paragraph 1 or 2:

1.      Depressive disorder, characterized by <u>five</u> or more of the following:

  a.  Depressed mood;
  b.  Diminished interest in almost all activities;
  c.  Appetite disturbance with change in weight;
  d.  Sleep disturbance;
  e.  Observable psychomotor agitation or retardation;
  f.  Decreased energy;
  g.  Feelings of guilt or worthlessness;
  h.  Difficulty concentrating or thinking; or
  i.  Thoughts of death or suicide.

10.[6]   Bipolar disorder, characterized by <u>three</u> or more of the following:

  a.  Pressured speech;
  b.  Flight of ideas;
  c.  Inflated self-esteem;
  d.  Decreased need for sleep;
  e.  Distractibility;
  f.  Involvement in activities that have a high probability of painful consequences that are not recognized; or
  g.  Increase in goal-directed activity or psychomotor agitation.

---

[6]  This appears to be an error in the Listing that should read "2."

AND

B.     Extreme limitation of one, or marked limitation of two, of the
       following areas of mental functioning (see 12.00F):

1.  Understand, remember, or apply information (see 12.00E1).
2.  Interact with others (see 12.00E2).
3.  Concentrate, persist, or maintain pace (see 12.00E3).
4.  Adapt or manage oneself (see 12.00E4).

OR

C.     Your mental disorder in this listing category is "serious and
       persistent;" that is, you have a medically documented history
       of the existence of the disorder over a period of at least 2
       years, and there is evidence of both:

1.     Medical treatment, mental health therapy, psychosocial
       support(s), or a highly structured setting(s) that is ongoing
       and that diminishes the symptoms and signs of your mental
       disorder (see 12.00G2b); and

2.     Marginal adjustment, that is, you have minimal capacity to
       adapt to changes in your environment or to demands that are
       not already part of your daily life (see 12.00G2c).

Listing 12.06 requires a claimant to show:

A.  Medical documentation of the requirements of paragraph 1, 2, or
3:

1.     Anxiety disorder, characterized by three or more of the
       following;

       a.  Restlessness;
       b.  Easily fatigued;
       c.  Difficulty concentrating;
       d.  Irritability;
       e.  Muscle tension; or
       f.  Sleep disturbance.

7.     Panic disorder or agoraphobia, characterized by one or both:

       a.  Panic attacks followed by a persistent concern or worry
       about additional panic attacks or their consequences; or

b.   Disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces).

3.   Obsessive-compulsive disorder, characterized by <u>one</u> or both:

a. Involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or
b. Repetitive behaviors aimed at reducing anxiety.

AND

B.   Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).
2. Interact with others (see 12.00E2).
3. Concentrate, persist, or maintain pace (see 12.00E3).
4. Adapt or manage oneself (see 12.00E4).

OR

C.   Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1.   Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
2.    Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

Listing 12.08 requires a claimant to show:

A. Medical documentation of a pervasive pattern of <u>one</u> or more of the following:

1. Distrust and suspiciousness of others;
2. Detachment from social relationships;
3. Disregard for and violation of the rights of others;

    4. Instability of interpersonal relationships;
    5. Excessive emotionality and attention seeking;
    6. Feelings of inadequacy;
    7. Excessive need to be taken care of;
    8. Preoccupation with perfectionism and orderliness; or
    9. Recurrent, impulsive, aggressive behavioral outbursts.

AND

B.    Extreme limitations of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

    1. Understand, remember, or apply information (see 12.00E1).
    2. Interact with others (see 12.00E2).
    3. Concentrate, persist, or maintain pace (see 12.00E3).
    4. Adapt or manage oneself (see 12.00E4).

Listing 12.11 requires a claimant to show:

A.    Medical documentation of the requirements of paragraph 1, 2, or 3:

1.    <u>One</u> or both of the following:

    a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
    b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").

3.    Significant difficulties learning and using academic skills; or

4.    Recurrent motor movement or vocalization.

AND

B.    Extreme limitations of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

    1. Understand, remember, or apply information (see 12.00E1).
    2. Interact with others (see 12.00E2).
    3. Concentrate, persist, or maintain pace (see 12.00E3).
    4. Adapt or manage oneself (see 12.00E4).

Landis contends that it "appears uncontroverted" that he meets the paragraph "A" requirements for all four of these Listings.  Pl.'s Mem. at 45.  According to plaintiff, the only issue on appeal is whether he meets the standards set forth in the paragraph "B" and/or "C" criteria for one or more of these four Listings.  Pl.'s Mem. at 45.

This argument must also be rejected.  The Commissioner has not made any such concession on appeal.  Def.'s Mem., Dkt. No. 25, 11.  Nor did the ALJ make any such concession in her written decision.  R. at 1010-11.  This is a problem for Landis, since he bears the burden at this step to prove that he meets *all* of the requirements necessary to satisfy one or more of the Listings.  *See, e.g.*, *Monsoori v. Comm'r of Sec. Sec.*, 2019 WL 2361486, at *3 (W.D.N.Y. June 4, 2019) ("The claimant bears the burden at step three to prove he or she meets the requirements necessary to meet or equal the Listings.").

Indeed, Landis's argument on this point appears to conflate the specific, enumerated requirements of each Listing in Section 12.00 with the fact of his mental diagnoses, since there is no dispute that he has been diagnosed by his medical providers with one or more conditions that qualify as mental disorders.

But as is true at step two, "[a] mere diagnosis is insufficient to meet or equal a listed impairment."  *Dechbery v. Berryhill*, 2020 WL 2523045, at *8 (E.D.N.Y. May 18, 2020); *see also Williams v. Bowen*, 859 F.2d 255, 259 (2d Cir. 1988) ("The Secretary correctly argues that it is not sufficient that there be a diagnosis of a listed impairment.").

Assuming, for argument's sake, that Landis does meet the detailed paragraph "A" criteria for all four of the different Listings he identifies, the burden remains on plaintiff to

satisfy the paragraph "B" criteria[7], which are common across all four entries:

> B.  Extreme limitations of one, or marked limitation of two, of the
> following areas of mental functioning (see 12.00F):
>
> 1. Understand, remember, or apply information (see 12.00E1).
> 2. Interact with others (see 12.00E2).
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
> 4. Adapt or manage oneself (see 12.00E4).

*See* Listings 12.04, 12.06, 12.08, 12.11.[8]

The ALJ concluded that Landis did not meet this paragraph "B" criteria because he had only "moderate" limitations in these four functional areas.  R. at 1011.  In reaching those conclusions, the ALJ acknowledged that "some opinion evidence of record supports greater limitations in these domains" but found that those contrary assessments were "not consistent with the medical evidence."  *Id*.

Landis argues this is reversible error by claiming that, as both a child and as an adult, he has suffered from "marked" limitations in all four of these functional areas.  Pl.'s Mem. at 48.  Plaintiff relies on opinion evidence from Richard Liotta, Ph.D., who in 2007 opined that plaintiff's "ability to concentrate and persist appeared impaired and appears to be a longstanding deficit for him."  *Id*.  Plaintiff also relies on a series of low global assessment of functioning ("GAF") scores from 2009, 2010, and 2011.  *Id*.  Plaintiff's argument and associated citation to case law indicates his belief that the ALJ ignored, or perhaps failed to consider, this particular evidence.  *Id*. at 48-51.

"The GAF is a scale promulgated by the American Psychiatric Association to assist in

---

[7]  Listing 12.04 and Listing 12.06 can also be satisfied by paragraph "C" criteria, but Landis's argument focuses on the "B" criteria common to all four.  *See* Pl.'s Mem. at 45-51.

[8]  The references to other subsections of the Listings found nested in the paragraph "B" criteria link to detailed definitions of those four areas of mental functioning.

tracking the clinical progress of individuals [with psychological problems] in global terms." *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (internal quotations omitted); *see also Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) ("GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social and occupational functioning.").

But a review of the written decision confirms that the ALJ did not ignore or fail to consider these data points.[9]  The ALJ considered Landis's GAF scores, noting that at various times they had ranged between 45 and 50.  R. at 1019.  The ALJ also acknowledged that a GAF score below 50 is generally "indicative of serious symptoms or limitations in social, occupational, or school functioning."  *Id*.

However, the ALJ also noted that GAF scores are not dispositive as to the question of disability.  R. at 1019.  That observation is in accord with the relevant case law, since "GAF scores—in and of themselves—do not demonstrate that an impairment significantly interferes with a claimant's ability to work."  *Haddad v. Comm'r of Soc. Sec.*, 2020 WL 597382, at *5 (W.D.N.Y. Feb. 7, 2020) (citation omitted).

In fact, the Agency "has also explained that the GAF scale does not correlate with the severity requirements in the Commissioner's regulations."  *Haddad*, 2020 WL 597382, at *5.  And more recently, the Agency has limited the use of GAF scores, advising ALJs to treat GAF scores as opinion evidence in light of the difficulty associated with standardizing them between different sources.  *See, e.g.*, *Mainella v. Colvin*, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014).

---

[9]  To the extent Landis's argument on this point can be read as a broader, more general challenge to the ALJ's weighing of the opinion evidence in the record, that argument will be addressed in the next section.

In other words, the ALJ did not ignore Landis's GAF scores; rather, her analysis followed the relevant developments in the governing law.  As the Commissioner points out, plaintiff has not actually identified any legal error on this point.  Instead, plaintiff's brief invites the Court to re-weigh the GAF scores, in combination with his preferred opinion evidence from Dr. Liotta, to reach a more restrictive result as to the paragraph "B" criteria.

That invitation must be declined, since a reviewing court "defer[s] to the Commissioner's resolution of conflicting evidence."  *Lewis v. Colvin*, 122 F. Supp. 3d 1, 7 (N.D.N.Y. 2015) (citation omitted).  Accordingly, the ALJ did not commit reversible error at step three.

### 3.  <u>The Remand Order & the Opinion Evidence</u>

"Where, as here, the ALJ finds at step two that a claimant has one or more 'severe' impairments but determines at step three that the claimant is not presumptively disabled, the ALJ must go on to make an RFC finding, which is an assessment of 'what an individual can still do despite his or her limitations.'"  *Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 192 (N.D.N.Y. 2019) (quoting *Cox v. Astrue*, 993 F. Supp. 2d 169, 183 (N.D.N.Y. 2012) (McAvoy, J.)).

"In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and symptomatology], including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Samantha S. v. Comm'r of Soc. Sec.*, 385 F. Supp. 3d 174, 183 (N.D.N.Y. 2019) (citation omitted).

"The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical

evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626 (S.D.N.Y. 2019) (citations omitted).  "In practice, administrative law judges rely principally on medical source opinion and subjective testimony when assessing impaired individuals' ability to engage in work-related activities." *Tammy Lynn B.*, 382 F. Supp. 3d at 192-93 (citation omitted).

Broadly speaking, the Regulations divide evidence from a claimant's medical sources into three categories:  (1) treating; (2) acceptable; and (3) other.[10]  The most important of these is the treating source category, which includes a claimant's "own physician, psychologist, or other acceptable medical source" who has provided "medical treatment or evaluation and who has, or has had an ongoing treatment relationship" with the claimant.  *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).

The opinion of a treating source regarding the nature and severity of a claimant's impairments is entitled to *controlling* weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).  However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative."  *Id*.  And when a treating source's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts, an ALJ may afford it less than controlling weight.  *Id*.

---

[10]  On January 18, 2017, the Social Security Administration made revisions to the rules regarding the evaluation of medical evidence.  Because plaintiff's claim was filed before March 27, 2017, the prior policies govern here.  *See, e.g.*, *Daniels ex. rel. D.M.G. v. Comm'r of Soc. Sec.*, 2018 WL 5019746, at *6 n.13 (S.D.N.Y. Sept. 30, 2018) (explaining the elimination of the treating physician rule and related changes); *Perez v. Comm'r of Soc. Sec.*, 2019 WL 359980, at *6-*7 nn. 6-8 (E.D.N.Y. Jan. 29, 2019) (explaining various changes effective to claims filed after March 27, 2017).

In fact, a treating physician's opinion may also be properly discounted, or even entirely rejected, when:  (1) it is internally inconsistent; (2) the source lacks underlying expertise; (3) the opinion is brief, conclusory, or unsupported by clinical findings; or even where (4) it "appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected."  *Tammy Lynn B.*, 382 F. Supp. 3d at 193 (citation omitted).

Where an ALJ decides to afford a treating source's opinion less than controlling weight, he must still consider various factors in determining how much weight, if any, to give the opinion, including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) what evidence supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the area of specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant in claimant's particular case.  *Tammy Lynn B.*, 382 F. Supp. 3d at 193-94 (citation omitted).

Beyond this so-called "treating physician rule," the same six factors set forth above apply with equal force to the evaluation of the remaining categories of medical evidence recognized by the Regulations:  the "acceptable" and "other" sources mentioned earlier.  *Tammy Lynn* B., 382 F. Supp. 3d at 194 (citation omitted).  The former, those deemed "acceptable" sources, include "licensed physicians (medical or osteopathic doctors, psychologists, optometrists, podiatrists, and speech-language pathologists." *Id*.  The latter category, deemed "other" in Administration parlance, are "ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists." *Id*.

Importantly, only evidence from a "treating" or "acceptable" source can be relied upon

to establish the *existence* of a medically determinable impairment.  *Tammy Lynn B.*, 382 F. Supp. 3d at 194 (citation omitted).  However, evidence from all three sources "can be considered when determining severity of impairments and how they affect individuals' ability to function."  *Id*.

Finally, while the six-factor analysis set forth above applies in all cases except where "controlling" weight is given to a treating physician's opinion, an ALJ need not mechanically recite these factors as long as the record reflects a proper application of the substance of the rule.  *See, e.g.*, *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (noting that an ALJ need not expressly recite each factor so long as it is "clear from the record as a whole that the ALJ properly considered" them).

Landis argues that the ALJ violated the Appeals Council's remand order by mis-weighing or improperly discrediting evidence from certain sources.  Pl.'s Mem. at 33-45.  Plaintiff also raises a number of discrete arguments as part of this broader challenge to the ALJ's analysis of the opinion evidence.

First, Landis argues the ALJ erred because she "gave controlling weight to *some* of the findings and opinions of the one-time examining consultant, Brett Hartman, Ph.D." instead of "giving controlling weight to the treating doctors, social workers, and psychologists."  Pl.'s Mem. at 43.  According to plaintiff, Dr. Hartman's opinions "are inconsistent with the rest of the medical record, including the opinions of the Commissioner's other consultant, Dr. Liotta."  *Id*. at 44.

Second, Landis argues that the non-examining, consultative opinion of "M. Marks" should not have been given "great weight."  Pl.'s Mem. at 44.

Third, Landis argues the ALJ should have re-contacted his treating sources "to get

further support for their opinions and conclusions," and that not doing so violated the remand order.  Pl.'s Mem. at 45.

As is often the case in Social Security law, these arguments "confuse process with outcome."  *Jennifer Rose D. v. Comm'r of Soc. Sec.*, 2020 WL 68615, at *5 (N.D.N.Y. Jan. 7, 2020).  As an initial matter, a review of ALJ Sparks's written decision confirms that she did not violate the Appeals Council's remand order.

The remand order directed the ALJ to give further and more detailed consideration to the medical and non–medical source opinions, including in particular Dr. Eyler's opinion, which included the GAF score discussed above.  R. at 1143.  Although the remand order left open the possibility that the ALJ "may request the medical sources provide additional evidence and/or further clarification," the Appeals Council's written instructions did not mandate that particular course of action.  *See id.*

That is an important distinction.  Since the ALJ was not necessarily obligated to re-contact any particular source, the burden falls on Landis to explain who should have been re-contacted and why that course of action was necessary.  But plaintiff has not done much to articulate answers to these questions, especially in light of the fact that the vast majority of the evidence cited as support in his brief pertains to his childhood history, a period of time well before his amended onset date of July 31, 2010.  *See* Pl.'s Mem. at 37-45.

It is clear that "[t]he ALJ is obligated to develop a reasonably thorough record, which includes filling in any obvious gaps."  *Jennifer Rose D.*, 2020 WL 68615, at *6.  However, an ALJ is not obligated to re-contact "every medical source who offered a less-than-perfect opinion or an opinion that the ALJ chose not to fully adopt for one reason or another."  *Id*.  Since Landis has failed to show that the ALJ violated the remand order, his threshold

argument will be rejected.

Landis's challenge to the ALJ's evaluation of Dr. Hartman's opinion fares no better.  Plaintiff was seen by Dr. Hartman in October 2018 for a consultative psychiatric evaluation.  R. at 1015.  Dr. Hartman confirmed plaintiff's diagnoses of Tourette's Syndrome, social phobia, depressive disorder, ADHD, and other mental disorders.  *Id*.

After the examination, Dr. Hartman assessed Landis with "marked difficulties dealing appropriately with life stressors." R. at 1016.  However, he did not assess "marked" difficulties in any areas of vocational (*i.e.*, work-related) functioning.  *Id*.  Instead, he laid out a series of "mild to moderate" limitations in plaintiff's ability to complete work-related mental activities.  *Id*.  Accordingly, the ALJ found Dr. Hartman's report to be consistent with her paragraph "B" analysis of plaintiff's functional limitations.  *Id*.

Landis contends this amounts to reversible error because Dr. Hartman's conclusions are not fully supported by some of his clinical findings, including plaintiff's difficulty with calculations and with "serial 3s." Pl.'s Mem. at 43.  However, as the Commissioner notes, the observation plaintiff finds objectionable is just "one small piece" of the evidence and observations that Dr. Hartman had before him at the time of his consultative examination.  Plaintiff's focus on this issue ignores the reality of the ALJ's function, which is to weigh conflicting evidence and make a final decision on an administrative claim for benefits.  There is no blanket rule that requires the ALJ to completely reject an opinion if the source's reasoning is less than perfect.  *Cf. Jennifer Rose D.*, 2020 WL 68615, at *6.

Landis further argues that Dr. Hartman did not review any of his childhood medical records.  Pl.'s Mem. at 43.  That may be true.  Although Dr. Hartman took a background history from plaintiff and from plaintiff's mother, who drove him to the evaluation, a review of

the written psychiatric evaluation leaves this question unanswered.  R. at 412-16.  But again, that kind of shortcoming does not mean that Dr. Hartman's opinion and findings must necessarily be discounted.  Rather, the ALJ was obligated to weigh all of the various opinions in the record in accordance with the Regulations and to make a final decision based on substantial evidence.

Landis makes a similar argument with respect to the ALJ's evaluation of the opinion of state agency reviewing psychologist M. Marks.  Pl.'s Mem. at 44-45.  According to plaintiff, it was improper for the ALJ to give "great weight" to Dr. Marks because he did not examine plaintiff and his credentials are not present in the record.  *Id*.  However, as the Commissioner explains, the record does show that Dr. Marks was a "psychological consultant," which required him to be a "qualified psychologist" in accordance with Agency guidelines.  Def.'s Mem. at 6; *see also* R. at 417.

A review of the ALJ's consideration of Dr. Marks's opinion demonstrates that it conformed to the relevant legal standard.  R. at 1016.  "The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."  *Camille v. Colvin*, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015) (quoting *Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order)).  As relevant here, the ALJ concluded that Dr. Marks's opinion was "mutually supportive" with Dr. Hartman's in-person, consultative findings, and that neither source's findings were meaningfully contradicted by the more recent evidence in the record.  *Id*. at 1019.

The Court notes that both Dr. Hartman's and Dr. Marks's opinions were rendered in late 2010, relatively early in the disability period under review.  However, as the

Commissioner correctly points out, the ALJ explicitly recognized this shortcoming.  R. at 1016 ("The record contains a great deal of new medical evidence since the last time this case was decided at the ALJ level . . . . ").  The ALJ then went on to conduct a thorough evaluation of the more recent evidence, and to compare and contrast it with the earlier findings on which she ultimately relied.  *Id.* 1016-19.  In the absence of a rule stating that early evidence must be discounted, the Court is hard-pressed to conclude the ALJ's thorough, longitudinal discussion of the record in this case amounts to an error, reversible or otherwise.

Finally, Landis challenges the ALJ's decision to partially discount Dr. Liotta's October 2018 opinion.  Pl.'s Mem. at 41-43.  Dr. Liotta's consultative examination concluded that plaintiff has "marked" limitations for social functioning, "significant impairment" for attending and concentrating, and "marked" limitation for adaptation.  R. at 1017.  The ALJ gave this opinion "significant weight," finding that the nature of the limitations assessed by Dr. Liotta were "generally consistent with the medical evidence."  *Id*. at 1018.  Even so, the ALJ concluded that Dr. Liotta over-estimated the severity of those particular mental restrictions.  *Id*.

In reaching that conclusion, the ALJ contrasted Landis's reported statements to Dr. Liotta with his earlier counseling notes from Licensed Mental Health Counselor ("LMHC") Amy Weir in April of 2018.  R. at 2232-2327.  In the ALJ's view, plaintiff's documented improvement as a result of his counseling sessions with LMHC Weir, along with his substance abuse treatment and his "general lack of ongoing treatment from 2010 to 2017," undermine Dr. Liotta's more severe restrictions.  *Id*. at 1018.

Although Landis disagrees with this conclusion, he has not demonstrated that it amounts to a legal error.  *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per

curiam) ("The substantial evidence standard means that once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."  (emphasis in original))

In sum, an independent review of the ALJ's written decision confirms that she applied the correct legal standards, identified substantial evidence in support of her partially contrary findings, and supplied a sufficient narrative rationale to permit meaningful judicial review of her conclusions.  Perfect or not, the ALJ pieced together an overall RFC assessment using properly submitted medical opinions and other competent evidence in the 2,300-page administrative record.  Accordingly, Landis's arguments on this point will also be rejected.

### 4. Subjective Testimony

Finally, Landis argues that the ALJ erred in partially discrediting his subjective testimony about the limiting effects of his impairments.  Pl.'s Mem. at 53-57.  According to plaintiff, there is no evidence in the record to suggest that plaintiff is malingering or is otherwise not a fully credible reporter of his own limitations.  *Id*. at 56.  In plaintiff's view, the ALJ failed to "sufficiently explain what evidence supported her negative credibility determination."  *Id*. at 57.

The ALJ must take the claimant's reports of pain and other subjective symptomatology into account when formulating the RFC.  *See, e.g.*, *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  Generally speaking, this requires the ALJ to "carefully consider" seven factors, including a claimant's ability to perform "daily activities" and the "location, duration, frequency, and intensity of [their] pain or other symptoms."  20 C.F.R. § 404.1529(c)(3); *see*

*also* SSR 16-3p.[11]

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of other evidence in the record."  *Barry v. Colvin*, 606 F. App'x 621, 622-23 (2d Cir. 2015) (summary order) (citation omitted).  "Where the record evidence does not fully support a claimant's testimony, the ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms."  *Samantha S.*, 385 F. Supp. 3d 187 (citation omitted).

"First, the ALJ must determine whether, based on the objective medical evidence, a claimant's medical impairments could reasonably be expected to produce the pain or other symptoms alleged."  *Samantha S.*, 385 F. Supp. 3d at 187 (citation omitted).  "Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work."  *Id.*

"At this second step, the ALJ must consider:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and

---

[11] SSR 16-3p superseded SSR 96-7p in 2016.  The standard for evaluating a claimant's testimony remains the same, but the term "credibility" has been eliminated to make clear that "the subjective symptom evaluation is not an evaluation of the claimant's character."  *Adriane W. v. Comm'r of Soc. Sec.*, 2019 WL 1988747, at *10 n.3 (N.D.N.Y. May 6, 2019) (Dancks, M.J.).

restrictions due to his pain or other symptoms." *Samantha S.*, 385 F. Supp. 3d at 187-88 (citation omitted).

"As before, an ALJ's [f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination." *Samantha S.*, 385 F. Supp. 3d at 188 (citation and internal quotation marks omitted). "In other words, an ALJ must discuss the relationship between the plaintiff's medically determinable impairment, the plaintiff's reported symptoms, his conclusions regarding the plaintiff's functioning, and why the plaintiff's reported symptoms are or are not consistent with the evidence in the record." *Id*.

Measured against this body of law, Landis's complaints about the ALJ's evaluation of his testimony must be rejected. As an initial matter, the ALJ correctly summarized plaintiff's testimony from the December 2018 hearing:

> At the December 2018 hearing, the claimant testified that he is unable to work primarily due to anxiety and ADHD; he stated that he believes others are staring at him and making fun of him, due to his anxiety, as well as verbal tics related to his Tourette's, and that he is unable to focus on any tasks for more than a few minutes. Regarding his daily activities, the claimant reported that he has difficulty sleeping due to racing thoughts, takes naps during the day, paces or walks around a lot, takes his dog for walks, and watches sports on television to "drown out [his] thoughts," but he does not read or play video games due to lack of attention. He also stated that he lives with his mother and does not do any chores except tending to the dog. As for medication, the claimant stated that he as been on-and-off medication his entire life, but he has refused to take medication at certain points because they made him feel like a "zombie."

R. at 1012; *see also* R. at 1085-1114.

After an exhaustive examination of the evidence, the ALJ found this testimony from

Landis only "partially" consistent with the record.  R. at 1012-19.  In making that determination, the ALJ carefully noted a pattern that developed during the relevant time period:  plaintiff would appear for an initial evaluation, but would then fail to appear for any follow-up treatment.  *Id*.

In the ALJ's view, the vast majority of the documented treatment Landis actually received has been for substance abuse, especially in 2012 and in December 2014 following the death of his grandmother.  R. at 1012-19.  As the ALJ explained, outside of these episodes plaintiff received basically no ongoing treatment for his various mental health issues until November 2017, when he finally committed to outpatient therapy with LMHC Weir.  *Id*. at 1019-20.

In cases where a claimant alleges mental limitations, courts recognize that a claimant's failure to comply with treatment might itself be a symptom of a claimant's mental condition.  *Jimmeson v. Berryhill*, 243 F. Supp. 3d 384, 391 (W.D.N.Y. 2017) (collecting cases).  But courts have also recognized that a claimant's inconsistent participation with mental health treatment can still be a permissible factor to consider when evaluating a claimant's testimony.  *Lesanti v. Comm'r of Soc. Sec.*, –F. Supp. 3d–, 2020 WL 500986, at *8 (W.D.N.Y. Jan. 8, 2020) (collecting cases).

In other words, the ALJ did not err in relying, in part, on Landis's long-running failure to seek consistent treatment for his conditions (outside of substance abuse).[12]  The ALJ also permissibly compared and contrasted plaintiff's testimony about his ability to perform

---

[12]  The ALJ also noted plaintiff's more recent compliance with therapy from LMHC Weir and the fact plaintiff began taking lithium in December 2018 based on another provider's assessment of bipolar disorder. R. at 1020.  To the extent those developments might reflect a change or deterioration in plaintiff's condition, the appropriate remedy would likely be a new disability application.

activities of daily living with reports plaintiff made to other providers.

For example, although Landis considers himself "very limited" in his activities of daily living, Pl.'s Mem. at 57, there is evidence in the record that plaintiff worked full- and part-time installing flooring and carpets with his uncle in early 2015. R. at 1014. The ALJ also noted that plaintiff reported to Dr. Hartman that he is able to prepare simple meals, clean up after himself, do his own laundry, and assist with other housework. *Id*. at 1015.

As the ALJ found, Landis's claim of being "unable to concentrate or sit still" was contradicted by his admission to Dr. Hartman that he "spends his days watching television, especially televised movies." R. at 1015; *see also Alexandrea R.R. v. Berryhill*, 2019 WL 2269854, at *9 (N.D.N.Y. May 28, 2019) ("The ALJ is often looking to see whether a claimant's testimony during the benefits hearing is in line with statements they have made to their own treatment providers at some point in the past.").

These findings, considered individually, would probably not have provided a sufficient basis on which to totally or completely reject Landis's testimony of the more severe limitations stemming from his mental impairments. But considered together, they do tend to cast doubt on the notion that plaintiff's subjective symptomatology is precisely as severe as he has claimed.

In other words, these findings are sufficient to support the ALJ's decision to *partially* discount Landis's testimony. *Pollino v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 428, 439 (W.D.N.Y. 2019) (citation omitted) ("[C]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable."). Accordingly, the ALJ did not err in evaluating plaintiff's testimony.

## IV. __CONCLUSION__

The ALJ applied the appropriate legal standards and supported her written decision with substantial evidence in the record.

Therefore, it is

ORDERED that

1.  The Commissioner's decision is AFFIRMED;

2.  Landis's motion for judgment on the pleadings is DENIED;

3.  The Commissioner's motion for judgment on the pleadings is GRANTED; and

4.  Landis's complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.


Dated:  May 28, 2020
          Utica, New York.

United States District Judge